UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

_____

| ELAINE L. CHAO, Secretary of Labor, | ) | |
| United States Department of Labor, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 1:06-CV-226 (lead case) |
| | ) | |
| v. | ) | Judge Curtis L. Collier |
| | ) | |
| DAVID JOHNSTON, | ) | |
| | ) | |
| *Defendant*. | ) | |

_____

| PENSION BENEFIT GUARANTY | ) | |
| CORPORATION, a wholly owned | ) | |
| governmental corporation, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 1:06-CV-227 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| | ) | |
| DAVID JOHNSTON, | ) | |
| | ) | |
| *Defendant*. | ) | |

_____

**MEMORANDUM**

Before the Court is Defendant David Johnston's ("Johnston") motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (1:06-CV-226, Court File No. 5) (1:06-CV-227, Court File No. 7) as well as his briefs in support (1:06-CV-226, Court File No. 6) (1:06-CV-227, Court File Nos. 8 & 13). Plaintiffs Elaine L. Chao, Secretary of Labor, United States Department of Labor (the "Department of Labor") and Pension Benefit Guaranty Corporation ("PBGC") (collectively "Plaintiffs") filed very similar response briefs in opposition to Johnston's motions in both cases

(1:06-CV-226, Court File No. 9) (1:06-CV-227, Court File No. 11). Subsequently, Johnston filed reply briefs in both cases (1:06-CV-226, Court File No. 11) (1:06-CV-227, Court File Nos. 17 & 18). Since these cases were consolidated subsequent to the filing of the instant motions, the Court will consider both of Johnston's motions to dismiss simultaneously.

For the following reasons, the Court will **DENY** Johnston's motions to dismiss (1:06-CV-226, Court File No. 5) (1:06-CV-227, Court File No. 7).

I.  **PROCEDURAL HISTORY**

On October 19, 2006 PBGC, a wholly owned government corporation which serves as statutory trustee of several pension plans, filed a complaint against Johnston seeking to redress several alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. § 1001 *et. seq.*) in case number 1:06-CV-227. On the same day, the Department of Labor, which is charged with enforcing the provisions of ERISA, filed a complaint against Johnston in case number 1:06-CV-226. Johnston filed a motion to dismiss as well as a supporting brief in case number 1:06-CV-227 on February 26, 2007 (1:06-CV-227, Court File Nos. 7 & 8). On March 8, 2007 Johnston filed a motion to dismiss as well as a supporting brief in case number 1:06-CV-226 (Court File Nos. 5 & 6). On March 9, 2007, Johnston's lawyer filed a motion to file an amended brief in support of Johnston's motion to dismiss, alleging he was unaware of the other case filed by the Department of Labor when he first filed his motion to dismiss (1:06-CV-227, Court File No. 9). Specifically, due to the confusion regarding the filing of separate complaints, Johnston asserted his brief in support of his motion to dismiss contained errors and other inaccuracies which he wished to correct in his amended brief (*id.*). The Court granted Johnston leave to file his amended brief

2

(1:06-CV-227, Court File No. 12), which Johnston filed on March 29, 2007 (1:06-CV-227, Court File No. 13). Johnston subsequently requested leave to file a reply brief, which the Court granted (1:06-CV-227, Court File No. 15). On April 3, 2007, upon the motion of the Plaintiffs in both cases, case numbers 1:06-CV-226 and 1:06-CV-227 were consolidated since they involve virtually identical underlying facts and issues of law (1:06-CV-226, Court File No. 10).[1] Case number 1:06-CV-226 was designated the lead case (*id.*).

## II.   RELEVANT FACTS

These cases are premised upon the attempted enforcement of the provisions of ERISA in connection with two pension plans of SCT Yarns, Inc. ("SCT") (1:06-CV-226, Court File No.2, 1:06-CV-227, Court File No. 2).[2]   SCT was a Delaware corporation with operations located in Chattanooga, Tennessee and Washington, Georgia. SCT had two defined benefit pension plans for the benefit of its employees, SCT Yarns, Inc. Retirement Plan for Hourly Employees and the SCT Yarns, Inc. Retirement Plan for Salaried Employees ("the Plans"). These Plans were originally established in 1946, and as of 1998 the two Plans had 771 participates.

Beginning in 1996, SCT assumed responsibility for sponsorship and administration of the Plans. In 1998, Kenneth H. Combs, Jr. ("Combs") assumed responsibility for the Plans as trustee and the Chief Executive Officer, Director and majority owner of SCT.[3] Belinda Combs ("B.

---

[1] Both complaints are brought pursuant to the provisions of ERISA and allege Johnston knowingly participated in the fiduciary breaches of others with regard to two pension plans. They both allege the same facts and request largely similar relief.

[2] Unless otherwise indicated, all of the relevant facts are derived from Plaintiffs' complaints (1:06-CV-226, Court File No. 2, 1:06-CV-227, Court File No. 2).

[3] At that time, the Plans had aggregate assets totaling over $14 million.

3

Combs"), his wife, was the Secretary, Controller, and Director of SCT and signed documents as the Plan Administrator. Combs appointed Manning & Napier Advisory Advantage Corporation ("MNAAC") as the investment manager to the Plans. Exeter Trust Company ("Exeter") and Custody First ("Custody") provided custodial and administrative services to the Plans.

Sometime after Combs assumed responsibility for the Plans, Combs, along with two other men, Roderick Askew and Daniel Geiger ("Geiger") and their respective companies, misused and misappropriated the monies contained in the SCT pension plans for their own personal gain.[4] In 2000, Combs was advised the Plans contained a shortfall of funds necessary to meet the monthly pension payments.

Geiger conducted business through various entities, including USA Mining Inc. ("USAM"), its parent company USA Bullion, Inc. ("USAB"),[5] and an entity named Bugsy Malone's Speakeasy, LLC ("Bugsy"), which was charged with building a casino/gentlemen's club in Nevada.[6] During this time, David Johnston was an attorney with an office located in the District of Columbia. Even though Johnston claims he was retained by only one entity, USAM, Plaintiffs allege he provided

---

[4] All three men were criminally indicted in the Eastern District of Tennessee. Combs died after he was indicted, and to the best of the Court's knowledge, Askew remains a fugitive. Geiger was criminally convicted on August 16, 2004 (1:02-CR-187, Court File Nos. 221 & 323). Geiger's criminal conviction stems from the same underlying events of the complaints in this action. Geiger was ordered to pay $6,700,000.00 in restitution to PBGC as part of his sentence (1:02-CR-187, Court File No. 323). Geiger is currently serving a 108 month sentence of imprisonment. Geiger's criminal case is on appeal (1:02-CR-187, Court File No. 321).

[5] Geiger was the Chief Executive Officer and majority owner of USAM and USAB and Combs was an officer/director of both companies.

[6] Combs and Geiger were the owners of Bugsy's. Combs and Geiger entered into an equity funding agreement between the Plans and Bugsy's whereby the Plans agreed to fund up to 30% of the cost associated with Bugsy's development. It does not appear Plaintiffs allege Johnston escrowed any of the funds associated with this transaction.

4

escrow and legal services to several entities and individuals associated with the Plans including, but not limited to, Combs, Geiger, USAM, and USAB.[7]

### A. Transfers of the Plans' Assets to USAM and USAB

On September 24, 1999 Combs caused the Plans to lend $3,500,000.00 to USAM. Plaintiffs allege Combs failed to conduct adequate due diligence regarding the ability of USAM to repay this loan before lending the Plans' assets to USAM. On October 4, 1999, pursuant to instructions from Combs, $3,500,000.00 was wired to Johnston's escrow account for the benefit of the Plans. Johnston distributed the Plans' assets to himself ($99,800.00), Kutak Rock Law Firm ($5,000.00), SCT ($315,000.00), and USAM ($3,080,000.00).[8]

On December 3, 1999 Combs converted the Plans' loan to USAM to a 25% equity stock holding in USAM. Combs also committed the Plans to contribute an additional $2.7 million in order to fund the future capital needs of USAM. On December 10, 1999, Combs directed Custody to liquidate $730,000.00 from the Plans' accounts. These funds were wired to Johnston's escrow account on December 13, 1999, and he, in turn, wired these funds to two different USAM accounts the next day.

On January 3, 2000, USAM became a wholly owned subsidiary of USAB.[9] The Plans' USAM holdings were exchanged for USAB stock. On January 14, 2000 pursuant to instructions from Combs, Custody wired $1,970,000.00 from the Plans' accounts to Johnston's escrow account. A few days later, Johnston wired these funds to USAM, which, in turn, transferred $1,000,000 to

---

[7] Additionally, Plaintiffs allege Johnston took direction and instructions from Combs and Manson, who he claims were not his clients.

[8] Subsequently, USAM disbursed a large portion of the money to Geiger personally.

[9] Combs was the Chairman of the Board of Directors of USAB.

USAB.

On March 17, 2000, Combs caused the Plans to enter into a Stock Purchase Agreement with USAB. The agreement provided that upon the sale of USAM, USAB would pay the Plans $10.2 million in exchange for the Plans' ownership interest. In September of 2000, Combs amended this agreement and made the Plans guarantor of USAM for loans amounting to over $6,000,000.00. Specifically, the agreement made the Plans the guarantor of USAM for credit facilities through several entities and individuals, including Johnston. In December 2000, USAB merged into USAM and the Plans exchanged their USAB shares for a straight note in the amount of $10.2 million, due December 31, 2000. No security was requested, and the Plans received no payments. In April 2002, Combs executed a fixed-rate promissory note between the Plans and USAM for $7,200,000.00. USAM is in default on this note as it only made one payment.

**B. Plans' Assets in the Royalton Fund**

In February of 2000, Combs invested $2.5 million of the Plans' assets in the Royalton Principal-Protected Fund, Ltd. ("Royalton Fund"), an off-shore hedge fund incorporated in the British Virgin Islands, without receiving documents indicating the Plans owned the shares. On March 31, 2000 Combs authorized Jerry Brooks to liquidate $500,000.00 from the Royalton Fund.[10] USAB and SCT received these funds.

Jerry Brooks then asked his brother, an attorney named Bennie Brooks, to open a trust account for SCT. On August 17, 2000, Combs authorized the liquidation of $500,000.00 from the Royalton Fund and had the funds wired to Bennie Brooks' trust account for the benefit of the Plans.

---

[10] Jerry Brooks is the chief financial officer, majority owner, and director of a limited liability company which is the investment advisor to the Royalton Fund.

Bennie Brooks bought certificates of deposit (CDs) with these funds. In September 2000, Bennie Brooks liquidated the CDs and wired $200,000.00 to CIT Group/Commercial Services and $245,213.25 to Johnston's escrow account.[11] Of the funds sent to Johnston's escrow account, he wired some of the money to Tri-States Machinery Leasing, Inc. ("Tri-States") (a corporation wholly owned by Combs) and $72,500.00 to USAM, pursuant to the instructions of Combs.[12]

On November 15, 2000, James Lau wired $150,000.00 from his family trust to Johnston for the benefit of the Plans.[13] At the request of Tim Manson, vice president, director, and shareholder of SCT, Johnston wired these funds to SCT the next day. SCT promised to pay the family trust back. On November 20 and 21, 2000, Combs directed Johnston to pay $150,000.00 to the Lau Family Trust via an entity associated with Lau, from the Plans' assets to be liquidated from the Royalton Fund. On November 21, 2000 at Combs request, the Royalton Fund wired $600,000.00 for the benefit of the Plans to Johnston. Johnston, in turn, wired $149,000.00 to Tri-States, $150,000.00 to an entity associated with Lau, and $300,000.00 to SCT.[14]

USAM received $100,000.00 from the Lau Family Trust on November 24, 2000. Patterson Corey ("Corey"), an associate of Combs, lent USAM and Combs $105,000.00 to repay Lau. Corey and Combs executed a promissory note. Johnston handled this transaction by sending the documents to Corey and wiring the money to Lau. On January 3, 2001, the Royalton Fund wired $916,952.00 to Johnston for the benefit of the Plans. The next day Johnston wired $130,000.00 to Corey,

---

[11] These wire transfers did not indicate that the funds being transferred were Plan assets.

[12] Johnston also issued a nominal check to Combs.

[13] James Lau is a director of a company which serves as the investment manager to the Royalton Fund.

[14] Johnston again issued a nominal check to Combs.

$500,000.00 to Tri-States, and transferred $32,800.00 to his own account.

Overall, Combs and Geiger, individually as well as through their various business entities, breached their fiduciary duties by draining millions of dollars from the Plans for their personal benefit.[15] Large amounts of this money were transferred through Johnston's escrow account and Johnston received assets of the Plans as a result of his participation. Accordingly, Plaintiffs claim Johnston knowingly participated in the fiduciary breaches of Combs, Geiger, USAM, USAB, and SCT among others.

Plaintiff PBGC is a wholly-owned United States government corporation established to administer and enforce the provisions of ERISA, which became the statutory trustee of the Plans on May 11, 2001 after SCT filed for bankruptcy.[16] Plaintiff the Department of Labor, through its Secretary, is charged with enforcing the provisions of Title I of ERISA. The Department of Labor has the authority to seek relief under ERISA sections 409 and 502 (a)(2) and (5), 29 U.S.C. §§ 1109 and 1132 (a)(2) and (5), to redress violations, reverse prohibited transactions, and restore plan losses. It may also seek injunctions to prevent future violations of ERISA and prevent nonfiduciary parties-in-interest who knowingly participate in a fiduciary's violations from managing or providing services to employee benefit plans in the future. 29 U.S.C. §1132 (a)(5).

---

[15] The Department of Labor and PBGC both brought civil cases similar to the instant actions against Geiger in 2004 (1:04-CV-1; 1:04-CV-138). In those cases, this Court found Geiger as well as his companies were fiduciaries of the Plans who participated in transactions which are prohibited under the provisions of ERISA (1:04-CV-1, Court File Nos. 154 & 155). Ultimately, this Court entered judgment in favor of the Department of Labor and PBGC against Geiger and his companies (1:04-CV-1, Court File No. 157).

[16] "When an underfunded plan terminates, PBGC usually becomes the statutory trustee of the plan and, in any event, makes up any shortfall of the plan with its insurance funds to pay the plan's unfunded benefits" (1:06-CV-227, Court File No. 11). As statutory trustee, PBGC has the authority to collect any amounts owed to the terminated plans. 29 U.S.C. § 1342(d)(1)(B).

PBGC and the Department of Labor investigated numerous alleged violations of ERISA committed by individuals and entities associated with the Plans, including Johnston (1:06-CV-227, Court File No. 11). On December 17, 2003 Johnston signed an "Agreement to Toll the Running of the Statute of Limitations" with the Department of Labor and PBGC (*id.*). Johnston purposed to terminate the tolling agreement on July 21, 2006 triggering the ninety-day period in which to file an action. Plaintiffs filed their complaints within the respective time period on October 19, 2006 seeking equitable relief against Johnston to redress alleged violations of ERISA (*id.*).

### III. <u>STANDARD OF REVIEW</u>

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), the Court must construe the complaint in the light most favorable to the plaintiff, *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir. 1998); *State of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc.*, 856 F. Supp. 1229, 1232 (S.D. Ohio 1994), accept all the complaint's factual allegations as true, *Bloch*, 156 F.3d at 677; *Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 996 (6th Cir. 1994), and determine whether plaintiff has plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (May 21, 2007) (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The Court may not grant a motion to dismiss based upon a disbelief of a complaint's factual allegations. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (noting courts should neither weigh evidence nor evaluate the credibility of witnesses); *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990). Rather, the Court must liberally construe the complaint in favor of the party opposing the motion and may dismiss the case only where no set of facts could be proved consistent with the allegations which

9

would entitle the plaintiff to a recovery. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Miller*, 50 F.3d at 377.

In deciding a motion to dismiss, the question is "not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)(citations and quotation marks omitted). However, bare assertions of legal conclusions are insufficient. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). The "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* (emphasis in original).

"Unlike claims of fraud brought pursuant to Federal Rule of Civil Procedure 9(b), which require a heightened standard of pleading, claims brought under ERISA are subject only to the simplified pleading standard of Federal Rule of Civil Procedure 8. Accordingly, to survive this motion to dismiss, the Complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *In re Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002, 1015 -16 (S.D. Ohio 2006) (citations omitted).

## IV.  DISCUSSION

In his motions to dismiss, Johnston argues the allegations contained in Plaintiffs' complaints do not support a claim upon which relief can be granted since: (1) Johnston is not a "fiduciary" nor a "party-in-interest"who engaged in a prohibited transaction as those terms are defined under

ERISA, (2) Johnston may not be held liable as a nonfiduciary since Plaintiffs' complaints do not contain specific factual allegations he had knowledge he was dealing with Plan fiduciaries and/or Plan assets, and (3) Plaintiffs failed to initiate these actions within the applicable statute of limitations provided by ERISA; therefore, their complaints are time-barred. In their response briefs, Plaintiffs contend they do not allege Johnston was a fiduciary of the Plans. Instead, Plaintiffs claim Johnston is liable since he knowingly participated in the fiduciary breaches of others. Accordingly, it is not necessary to determine whether or not Johnston was a fiduciary of the Plans.

### A. Plaintiffs' Cause of Action

Plaintiffs' complaints allege Johnston was a party-in-interest with respect to the Plans within the meaning of section 3(14) of ERISA, 29 U.S.C. § 1002(14). Under the provisions of ERISA, Congress provided any person who provides services to an employee benefit plan is a party-in-interest. 29 U.S.C. § 1002(14)(B). Johnston argues the complaints make no factual allegation he provided "legal" services to the Plans. However, the complaints do make factual allegations Johnston escrowed Plan assets at the instruction and direction of several fiduciaries of the Plans. The Court finds these allegations, when liberally construed and taken in favor of Plaintiffs, are sufficient to withstand Johnston's motions to dismiss. It is not necessary to decide at this stage of the proceeding whether Plaintiffs will be able to prove Johnston was in fact a party-in-interest.[17]

---

[17] Additionally, Johnston argues the complaints do not contain any factual allegations the Plan or any of its fiduciaries entered into an agreement with Johnston. Johnston argues he was retained by USAM and only had a contractual relationship with that entity. However, this Court has previously found USAM was a fiduciary of the Plans (1:04-CV-1, Court File Nos. 154 & 155) ("[T]he Plans had an undivided interest in all of USAM and USAB's assets after December 3, 1999. Every individual who exercised authority or control over the underlying assets owed a fiduciary duty to the Plans. USAM and USAB exercised control over their assets and therefore were fiduciaries of the Plans."). Accordingly, this argument has no merit.

Plaintiffs argue they successfully assert a cause of action against Johnston in their complaints. Specifically, Plaintiffs do not allege Johnston was a fiduciary of the Plans; instead, they base their claim upon several cases holding nonfiduciaries liable for their knowing participation in a fiduciary's breach of a duty in connection with an employee benefit plan covered by ERISA.[18] Plaintiffs principally rely on the Supreme Court case *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238 (2000). In *Harris Trust*, an ERISA pension plan entered into a prohibited transaction with a nonfiduciary party-in-interest. *Id*. at 242-43. The nonfiduciary moved for summary judgment arguing ERISA does not provide a cause of action against nonfiduciaries. *Id*.

---

[18] This rule applies in situations where a plaintiff is seeking equitable, not legal, relief. In 1988, the Sixth Circuit held a nonfidiciary may be liable for aiding and assisting a fiduciary in furthering his breach of fiduciary duty. *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988) (affirming district court's order that nonfiduciary must disgorge all money received from another fiduciary's breach of his duty). *Brock* was cited by courts in other circuits for recognizing a cause of action holding nonfiduciaries liable for knowingly participating in a fiduciary's breach of fiduciary duty. *Blevins Screw Products, Inc. v. Prudential Bache Securities, Inc*., 835 F.Supp. 984, 986 (E.D. Mich. 1993). In 1993, the Supreme Court stated, "while ERISA contains various provisions that can be read as imposing obligations upon nonfiduciaries . . . no provision explicitly requires them to avoid participation (knowing or unknowing) in a fiduciary's breach of fiduciary duty." *Mertens v. Hewitt Associates*, 508 U.S. 248, 253-54 (1993). In light of *Mertens*, it could be argued the cause of action recognized in *Brock* was no longer viable. However, it could also be argued the language in *Mertens* is merely dicta since the basis of the Supreme Court's decision was that the plaintiffs were seeking legal instead of equitable relief. *Id*. at 254-55. Ultimately, *Mertnes* held ERISA does not authorize suits for *money damages* against nonfiduciaries who knowingly participate in a fiduciary's breach. *Id*. (indicating the parties assumed a cause of action existed and addressed their arguments exclusively on what forms of relief are available, either legal or equitable). In *Mertens*, the Supreme Court specifically reserved ruling on whether a cause of action exists against a nonfiduciary under ERISA seeking equitable relief. *Id*. At least one court within the Sixth Circuit refused to recognize a cause of action against a nonfiduciary based upon the *Mertens*' decision. *See Blevins Screw Products, Inc. v. Prudential Bache Securities, Inc*., 835 F.Supp. 984, 986 (E.D. Mich. 1993) (dismissing plaintiff's claim for money damages since the "Supreme Court has determined that ERISA does not authorize suit against a nonfiduciary for knowing participation in a fiduciary's breach"). Subsequently, in 2000 the Supreme Court addressed this issue again in *Harris Trust and Sav. Bank v. Salomom Smith Barney, Inc*., 530 U.S. 238 (2000). *Harris Trust* seems to clarify any confusion which may have existed after the *Mertens* decision concerning this issue.

at 243-44. The Supreme disagreed and held a cause of action lies under ERISA against a nonfiduciary party-in-interest who knowingly participates in a transaction prohibited by ERISA § 406(a)(1) (29 U.S.C. § 1106 (a)). *Id*. at 244-45.

The Sixth Circuit has recognized the *Harris Trust* decision and asserted it "confirms earlier authority within this Circuit that permitted an action for disgorgement of profits against an ERISA nonfiduciary." *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 486 (6th Cir. 2001) (citing *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988)). The Sixth Circuit also pointed out several "limiting principles" of *Harris Trust*. *Id*. (finding the nonfiduciary status of several settling defendants under ERISA did not preclude non-settling defendants from asserting a contribution claim). "First, as the Court pointed out, any recovery against a nonfiduciary . . . is confined to 'appropriate equitable relief' [which includes restitution or disgorgement of wrongfully obtained plan assets or profits]. Second, a nonfiduciary is liable only for its 'knowing participation' in a fiduciary's breach. Third, at least on the facts of *Harris Trust*, liability was premised on the nonfiduciary's role as a party-in-interest to the prohibited transaction, though the Court's rationale would seem to apply to other nonfiduciaries as well." *Id*.

Plaintiffs are seeking equitable relief in the instant cases. Additionally, in *Harris Trust*, the Supreme Court found a transferee, such as Johnston, who wrongfully obtained plan assets may be held liable if he knew or should have known of the circumstances which rendered the transaction prohibited. *Id*. Therefore, based upon this precedent, it seems liability does not depend upon whether the nonfiduciary can be classified as a party-in-interest nor whether the nonfiduciary participated in a prohibited transaction. Accordingly, the relevant issue the Court must determine is whether Plaintiffs sufficiently alleged Johnston "knowingly" participated in another's fiduciary

breach. Johnston alleges the complaints fail to do this and therefore should be dismissed.[19]

First and foremost, Plaintiffs' complaints specifically allege Johnston "knowingly participated in the fiduciary breaches of Combs, B. Combs, Manson, Geiger, USAM, USAB, and SCT . . . and improperly received assets of the Plans as a result of such participation" (1:06-CV-226, Court File No. 2) (1:06-CV-227, Court File No. 2). In *Brock*, the Sixth Circuit indicated, "a nonfiduciary's knowledge of the breach can be inferred from surrounding circumstances raising a reasonable inference of knowledge." *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988). The facts alleged in the complaints indicate Johnston knew or clearly should have known he was handling the assets of the Plans. The complaints specifically list numerous instances in which Johnston took instructions from Combs, the Trustee of the Plans, as well as other fiduciaries concerning how to disburse millions of dollars of Plan assets which were placed into his escrow account.[20] Plaintiff's allegations include specific dates as well as specific amounts of money which were transferred through Johnston's escrow account. One allegation even asserts Johnston distributed some of the Plans' assets to SCT. The allegations of the complaints which describe the escrow transactions in which Johnston participated indicate the money was wired to his account "for

---

[19] Johnston also argues one of the provisions of Section 408(b) of ERISA exempts him from liability. That section provides the Plans are allowed to contract with a party for legal services if no more than reasonable compensation is paid. The transaction is "prohibited" if the compensation is "excessive." Johnston asserts he retained $132,600.00 or 1.6% of the total transactions the complaints allege he participated in. Johnston argues the complaints do not allege the fee Johnston received was not fair and reasonable. This is not an appropriate ground for dismissal of the complaints. Several factual determinations must be made in order to determine if this particular exemption applies. It is not appropriate for the Court to make such determinations at this stage of the proceeding. Therefore, this argument is without merit. However, the Court notes this argument seems to be inconsistent with Johnston's argument that he did not provide any services to the Plans.

[20] The complaints specifically allege most of the people and/or entities which Johnston took instruction from were fiduciaries of the Plans.

the benefit of the Plans," and Johnston distributed "the Plans' assets" as follows. When liberally construed in favor of Plaintiffs and taken as true, the Court finds the factual allegations in the complaints sufficiently allege Johnston either knew or should have known he was participating in the fiduciary breaches of others.[21] Overall, the complaints adequately set forth the underlying factual allegations as well as the basis for Johnston's alleged liability. Therefore, Plaintiffs' complaints should not be dismissed since it does appear they have provided enough facts to state a claim to relief which is plausible on its face. The Court also notes Plaintiffs are only required to put Johnston on notice of their claim for relief and are not required to actually prove their case at the motion to dismiss stage.

### B. Applicable Statute of Limitations/Tolling Agreement

Johnston argues Plaintiffs' complaints are time-barred. Plaintiffs counter this argument by asserting Johnston executed a valid enforceable agreement which effectively tolled the applicable statute of limitations ("tolling agreement").[22] In case number 1:06-CV-226, the Department of Labor submitted the tolling agreement as an exhibit to its brief in response to Johnston's motion to

---

[21] In his brief, Johnston cites cases from several other Circuits for the proposition that the Court "need not accept as true 'unsupported conclusions and unwarranted inferences.'" *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 n.13 (3d Cir. 1998). The Court finds Plaintiffs' complaints do not consist of conclusive allegations; instead, they are supported by factual allegations sufficient to state a cause of action.

[22] Johnston gave notice of his termination of the tolling agreement on July 21, 2006. The terms of the agreement provide "the running of all applicable statutes of limitations . . . shall be tolled . . . until and including a date 90 days after the date shown on the notice of termination properly served in the manner set forth in paragraph 3" (1:06-CV-226, Court File No. 9). Plaintiffs filed their complaints within the 90-day period. Paragraph 3 of the tolling agreement contains express provisions concerning the procedures for notice of termination. The parties do not dispute whether Johnston complied with these procedures.

15

dismiss (1:06-CV-226, Court File No. 9).[23] In case number 1:06-CV-227, PBGC makes allegations concerning the tolling agreement in its complaint and attached it as an exhibit to the complaint. (1:06-CV-227, Court File No. 2). Johnston does not dispute he executed such agreement or that it is not enforceable. Instead, he argues the claims contained in Plaintiffs' complaints fall outside the scope of the tolling agreement since the complaints do not allege a direct relationship between Johnston and the Plans.

The tolling agreement provides that the Department of Labor, PBGC, and Johnston agree to toll the statute of limitations set forth in ERISA "with respect to any act or omission of the Responding Parties [which includes Johnston] concerning the Plans" (1:06-CV-226, Court File No. 9). If the Court accepted Johnston's interpretation of the tolling agreement, it would devoid the agreement of all purpose. Under a plain reading of the tolling agreement Johnston clearly agreed to a tolling of the applicable statute of limitations for any acts "concerning the Plans." At the time the parties entered into the tolling agreement they more than likely had some understanding of the relevant facts. At that point, Johnston executed the tolling agreement containing this language. The complaints clearly allege Johnston "provided escrow and legal services to the Plans" (1:06-CV-226, Court File No. 2) (1:06-CV-227, Court File No. 2). They also allege Exeter, the custodian of the Plans' assets, wired $3.5 million of the Plans' assets to Johnston's escrow account, from which he transferred $99,800.00 to himself. *Id*. Therefore, the complaints sufficiently make allegations

---

[23] In case number 1:06-CV-226, Johnston did not mention the tolling agreement in connection with his motion to dismiss. He simply argued the applicable statute of limitations had expired. After the Department of Labor asserted the tolling agreement in its response brief, Johnston replied by focusing on the fact that the Department of Labor did not make allegations concerning the tolling agreement in its complaint. This argument is without merit since the statute of limitations is an affirmative defense which a defendant may assert.

Johnston participated in acts "concerning the Plans," and Johnston's argument that Plaintiffs' claims must be dismissed since they fall outside the scope of the tolling agreement is without merit.[24]

Additionally, the tolling agreement provides, the Department of Labor "may commence legal action against any or all of the Responding Parties [including Johnston] to enjoin acts and practices which violate the provisions of Title I of ERISA, and to obtain other appropriate equitable relief . . . [and] PBGC may commence a court proceeding . . . to collect liabilities owed to the Plans" (1:06-CV-226, Court File No. 9). As both Plaintiffs' complaints seek disgorgement of profits Johnston realized as a result of his alleged participation in acts which constituted violations of ERISA, it is clear the allegations in the complaints are within the scope of the tolling agreement. In rendering this finding, the Court is not determining whether Johnston will ultimately prevail on his statute of limitations defense. The Court is merely holding Plaintiffs are entitled to offer evidence to support their claims and similarly Johnston is entitled to offer evidence in support of his affirmative defense.

V.  **CONCLUSION**

For the foregoing reasons, the Court will **DENY** Johnston's motions to dismiss (1:06-CV-226, Court File No. 5 ) (1:06-CV-227, Court File No. 7).

An Order will enter.

---

[24] Also, as the Department of Labor asserts, "but for the Plans, there would be no ERISA coverage, and the DOL would have no lawsuit" (1:06-CV-226, Court File No. 9).

/s/
**CURTIS L. COLLIER
CHIEF UNITED STATES DISTRICT JUDGE**